**UNITED STATES of America**

v.

**Emanuel W. SIMPSON, Appellant.**

**No. 23352.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1970.

Decided Oct. 1, 1970.

Bazelon, Chief Judge, concurred and filed opinion.

Mr. Dennis G. Lyons, Washington, D. C. (appointed by this court), for appellant.

Mr. Broughton M. Earnest, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief for appellee.

Before BAZELON, Chief Judge and WRIGHT and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case involves the propriety of denial of a petition filed under 28 U.S.C. § 2255 without holding a hearing.

The petitioner pleaded guilty on March 12, 1969 to one count of armed robbery. He was represented by court-appointed counsel. He first admitted committing the offense of robbery. The District Court, taking commendable pains to satisfy itself as to the factual predicate of the plea, asked him to recount the circumstances of the robbery. Appellant said he had borrowed a revolver, with bullets, and gone to McKinley Tech High School's Credit Union, with the gun, and "I stole some money, and I ain't hurt nobody." He was then asked a standard series of questions by the Clerk, and his answers set forth that there had been no promises of any kind to induce a plea of guilty, that he had discussed the plea fully with his attorney, that he was aware that he might be sentenced to life imprisonment, that he was entering the plea of guilty voluntarily because he was guilty and for no other reason.[1]

On May 16, he was sentenced to 6 to 24 years on the first count, and the court, on the government's motion, dismissed the remaining ten counts of the indictment. No objection was voiced by petitioner at this time. The pro se petition under 28 U.S.C. § 2255, filed June 17, 1969, recited that defense counsel had told petitioner that he had talked with the judge and made arrangements that on a plea of guilty petitioner would receive a sentence under the Youth Corrections Act, that all that it was necessary for him to do was to give the appropriate answers, yes and no, when the judge asked him certain questions, and

everything would be taken care of. "Thusly petitioner was tricked and induced to enter said plea, on the day of sentencing."

The trial judge denied the petition without hearing on July 11, 1969, stating: "The motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." The judge noted that petitioner had said expressly at the plea-taking that no promises had been made, and had acknowledged that he could be sentenced to life imprisonment, that there was no representation of Youth Corrections Act by the court or any showing that any such expectation was induced by the government. The court noted: "It is not unusual and in fact it is likely that defense counsel did discuss the probabilities of sentence with defendant. This is not ineffective assistance of counsel; rather it is the opposite."

I

Obviously the district judge, who accepted the plea, took some pains in disposition of this petition. His opinion has been helpful in focusing the issue, and in avoiding the kind of arid remand which is sometimes necessitated when a petition for relief is denied without any accompanying statement. Moreover, if the case could now be disposed of on the basis of a prediction as to what is "likely" to eventuate, it may well be that the petition will prove on further hearing to be grounded in nothing more than a discussion of probabilities by defense counsel, the kind of discussion which the district judge correctly noted is a cause for commendation rather than condemnation.

However, we must take the case as we find it now. And the petition filed under 28 U.S.C. § 2255, taken on its face, and assuming the truth of its allegations, presented facts that would support a

---

1. When first asked if the guilty plea had been induced by promises, petitioner replied, "Yes, sir." The court asked what promises had been made, and petitioner replied: "No, no promises have been made

to me." The questions asked by the Clerk were in line with the Resolution adopted by the District Judges, see Everett v. United States, 119 U.S.App. D.C. 60, 61, 336 F.2d 979, 980 (1964).

claim of ineffective assistance of counsel and probably also of a guilty plea that was not voluntary because defendant had been falsely told by his attorney that the attorney had talked with the trial judge and had made an arrangement for Youth Corrections Act treatment.[2]

A defendant cannot claim *"coercion"* undercutting a guilty plea merely because he has been advised by his attorney that *e. g.* the judge will probably be more lenient than a jury, or is normally more lenient with defendants who plead rather than go to trial.[3] Nor is the guilty plea undermined by an allegation that counsel "assured" defendant that he would obtain certain treatment, even if embellished by the defendant's addition that he "presumed" that his attorney had in hand a promise or agreement on the part of the prosecutor or judge.[4] However, an allegation of false advice from counsel of an outright arrangement with the judge crosses the line, and would constitute, if proved, impermissible verbal coercion. In stating that the records of the District Court *conclusively* show that petitioner is entitled to no relief, the court did not grapple with the allegation that those records were devised so as to conceal the truth by precisely the alleged action of counsel outside the court room which provided the basis for a claim for relief.[5]

To some extent, the need for evidentiary hearings on petitions filed under 28 U.S.C. § 2255, can be avoided or confined by reasonable limitations as to the threshold showing required to impose a hearing requirement. A distortion rather than furtherance of the interest of justice might well be the likely product of a rule that inexorably required evidentiary hearings, even if the allegations are "vague, conclusory, or palpably incredible." [6] An evidentiary hearing is not required where a petition

2. United States v. Shneer, 194 F.2d 598, 600 (3d Cir. 1952) (relief warranted if defendant was misled by his counsel, "an officer of the court," alleged to have told defendant that Assistant United States Attorney had assured him that he would recommend to the court that sentence be limited to fine, without imprisonment); United States ex rel. Thurmond v. Mancusi, 275 F.Supp. 508, 516–517 (E.D.N.Y. 1967) (defendant's attorney responsible for defendant's mistaken belief that a plea agreement had been made); *see* United States ex rel. Elksnis v. Gilligan, 256 F. Supp. 244, 249 (S.D.N.Y.1966) approving view that the interest of justice requires vacating of guilty plea where no specific promise was made but guilty plea was entered as a result of grave misunderstanding solely on the part of defense counsel and not participated in by either prosecution or judge (dictum).

3. Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Indeed Justice White's opinion indicates that no coercion is provided by the actual certainty of better treatment on a guilty plea, and apparently even by a "promise" (at 750–751, 90 S.Ct. at 1470–1471). But that case obviously did not involve a misrepresentation, or a "promise" that was not kept.

4. United States ex rel. Homchak v. New York, 323 F.2d 449 (2d Cir. 1963); United States ex rel. Finn v. Klein, 271 F.Supp. 513, 515 (S.D.N.Y.1967).

5. Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). In Brady v. United States, *supra* note 3, an evidentiary hearing was held on the petitions alleging that defendant's counsel exerted impermissible pressure on him, and the guilty plea was induced by representations of clemency. The District Court made findings adverse to petitioner on both claims, and these findings were sustained on appeal.

6. *See* Machibroda v. United States, *supra*, 368 U.S. at 495, 82 S.Ct. at 514:
    What has been said is not to imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be. The language of the statute does not strip the district courts of all discretion to exercise their common sense. Indeed, the statute itself recognizes that there are times when allegations of fact outside the record can be fully investigated without requiring the personal presence of the prisoner.

is supported by mere general allegations of involuntariness.[7]

In Berryman v. United States, No. 22,-579 (January 9, 1970) (unreported) this court held that a claim that petitioner did not know and was not advised of the consequences of his plea should not be explored on the basis of general and purely conclusory allegations, and affirmed the dismissal of the petition without prejudice to the filing of a new and more specific petition.[8]

The procedure embodied in Rule 11 "is designed to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary." McCarthy v. United States, 394 U.S. 459, 465, 89 S. Ct. 1166, 1170, 22 L.Ed.2d 418 (1969). The careful plea-taking transcript not only supports the propriety of a rule rejecting any requirement of hearing based on mere generalized allegations of lack of voluntariness, but also raises the height of the hurdle that must be cleared by defendant, through affirmative proof tendered, even if allegations are specific enough to require an evidentiary hearing.

The need for such a doctrine is underscored by the consideration that otherwise there may be no protection from abuse of the judicial process by prisoners who have assurance from fellow inmates that their use of what is in effect a pre-prepared form will enable them to obtain a hearing promising at least some possibility, however slight, of relief.

■ Petitioner's assertion, however, is too specific to be denied as merely conclusory, and it cannot be said to be so "palpably incredible" as to permit rejection on the present record. He claims his counsel provided an assurance that the judge had agreed to a sentence under the Youth Corrections Act. The possibility that some statement was made concerning Youth Correction Act treatment is consistent with defendant's youth (20 years at time of offense) and corresponding lack of prior record as an adult.[9] The likelihood that petitioner will be able to establish that counsel made the presentation alleged in the pleading may be undercut by the high probability that defense counsel will give contrary testimony and by a disposition to credit statements by a member of the court's bar. And the plea transcript is undeniably of highest significance in any testing of the merit of the allegations. Yet these factors cannot be conclusive basis for rejection on the merits, without a hearing, of a pleading which alleges that this court record is itself the product of a distortion deliberately wrought by assigned counsel. Defendant's failure to speak up at sentencing time is a factor, but may prove to be understandable in terms of his confusion. Defendant's allocution [10] at the

---

7. Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 119, 76 S.Ct. 223, 100 L.Ed. 126 (1956); Legg v. United States, 350 F.2d 945 (6th Circuit 1965); United States ex rel. Homchak v. New York, *supra* n. 4.

8. A similar standard has been applied by this court on appeal of a criminal conviction to determine whether the record, or even allegations made outside the record, reveal the existence of a potential 2255 claim warranting a remand for further proceedings in the district court. *Compare* United States v. Weaver, 137 U.S.App.D.C. 274, 422 F.2d 711 (January 22, 1970) *with* Dorman v. United States, 140 U.S.App.D.C. —, 435 F.2d 385 (April 15, 1970).

9. At the time of the offense, petitioner was a student-trainee at Northern Systems, located at the site of the old National Training School.

Two weeks before petitioner was sentenced his codefendant was sentenced under the Federal Youth Corrections Act, 18 U.S.C. § 5010(e), for observation and study. The codefendant was subsequently given a sentence under that Act, 18 U.S.C. § 5010(c), for treatment and supervision for a period of ten years.

10. Petitioner's allocution was "I would like you to know that I realize the seriousness of my charge, and I would like for you to take into consideration that no one was hurt and all the money was recovered. I know my reason for being here

time of sentencing is certainly consistent with, though of course it does not conclusively establish, the understanding from counsel related in his petition. His failure to speak up after hearing the prison term actually imposed is a factor to be taken into account, but may well be understandable in terms of his confusion [11]—as to what happened, and why, and what his remedies might be, and what would be the appropriate way to present them. It was only a month after sentence that defendant executed the petition under 28 U.S.C. § 2255 that is now before us for consideration.

On this record we conclude that the petition should not have been dismissed, and that the case must be remanded for further proceedings.

## II

It seems appropriate for a court considering the kind of issue presented by this record to consider further whether the rule requiring evidentiary hearings must be accepted as an unavoidable burden on the courts that cannot be ameliorated, or whether there may not be approaches in the overall administration of justice that would operate to keep the courts open to avoid injustice yet avoid or at least lessen the possibility that they may be clogged by the requirement of hearings on petitions under 28 U.S.C. § 2255 that prove unmeritorious in fact.

1. We first consider the possibility of a procedure for amplifying the record that falls short of an evidentiary hearing. An "amplifying" procedure has been used by the court of appeals for coping with the interrelated problem of pro se petitions seeking appointment of counsel for appeals from the denial of relief.[12] An "amplifying" procedure may have some merit in the situation where it has been used by this court— where the petition as it stands is too conclusory or general to require judicial processing, yet there is an impression that there may well be something meritorious in the underlying situation if it could only be presented meaningfully. To move further and to adopt a procedure of communication with a petitioner not represented by counsel in a case where his petition is specific enough for judicial consideration raises difficult questions. The screening out of the frivolous and the focusing on the meritorious, or at least the more-meritorious, would seem an objective better achieved through interview with counsel than correspondence with the judge. The conclusion is heightened in a case like the one at bar where the typed petition, contrasting with the defendant's rough writing in other documents in the file and his limited education, makes it likely that his petition has been prepared with the help of a fellow inmate. Where the government does not provide legal assistance for inmates it cannot deny the poorly educated inmate the opportunity to consult other prisoners for assistance in seeking habeas corpus, coram nobis, or other collateral relief. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Yet the situation cannot be blinked that sometimes such avenues lead to the use of pre-prepared petitions, or a too-ready subscription to allegations that others have found to turn the key to a hearing. A court must at least be chary

---

today is to have sentence passed on me, so I am willing and I can be rehabilitated. All I need is a little help and guidance."

11. *See* United States ex rel. Thurmond v. Mancusi, *supra*, 275 F.Supp. at 512.

12. *See* form used in, e. g., Order dated November 4, 1969 in Goss v. United States, No. 22,600; Order dated February 26, 1970 in United States v. Edward D.

Wheeler, No. 23,921; Order dated February 26, 1970 in United States v. Francis R. Edwards, No. 23,909.

This court's orders are accompanied by a memorandum in which the court advises the applicant that the case will be dismissed unless he files "specific facts and details" of his grievance. "You should include all of the facts you consider important, and state them clearly and in your own words."

against indirectly referring the petitioner back to such channels,—of dubious reliability, and perhaps even bearing the taint of exploitation of the more gullible and illiterate inmates by their more fortunate brethren. It may be possible to have recourse to more reliable channels for probing the clarity and perhaps the reality of inmate's grounds for relief.[13] Probably both study and experiment would be necessary for pursuit of such possibilities.

2. Another approach that may be useful is use of the Federal magistrates.[14] Indeed we understand that the District Judge who entered the order under review has sought in another case to explore this approach and has made an innovative reference to the Federal magistrate. We are not called upon to consider what shape the assistance of the Federal magistrate may take. At a minimum the Federal magistrate may become a means for defining issues in cases slated to be heard by the judge; for identifying cases that can be disposed of without a hearing; and perhaps for clarifying applicable principles and securing voluntary withdrawal of non-meritorious cases.

3. In the last analysis, however, the problem of petitions for collateral review that are frivolous, incoherent, false because copied slavishly from winning patterns, or otherwise lacking real merit, seems likely to plague the courts until a system is established for providing legal counsel to federal prison inmates on a reasonably broad basis.

The provision of counsel to prison inmates has other, doubtless more important values, notably in terms of helping to achieve meaningful rehabilitation and adjustment to a post-prison life. But for present purposes it may be appropriate to focus on the benefits to the court system, and the administration of justice, that seem likely to ensue from provision of counsel to prison inmates before, and not only after, they file papers in court, to provide skills that can explain the limit of the points that may have merit, to help orient the inmate to realistic channels, perhaps in preparing materials for executive clemency, or parole.

There is a substantial literature on the interrelation of petitions for collateral review and legal assistance for prison inmates. A recent article by Bruce R. Jacob, and K. M. Sharma, Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process, 18 Kan.L.Rev. 493 (1970) surveys the literature and also gives us the benefit of the practical experience of the authors.[15]

13. *See* B. Jacob and K. Sharma, Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process, 18 Kan.L.Rev. 493, 526 (1970): "If, for practical reasons, it is impossible to appoint counsel even though one or more of the above circumstances are present [allegations as drafted do not warrant hearing but suggest the desirability of inmate's interview with counsel to probe the matter], the court may find it helpful to utilize techniques in the nature of discovery procedures to obtain a clearer picture of the inmate's case for relief. The method used need not be formal. He could, for instance, request prison officials, a caseworker, or a chaplain to talk with the inmate and obtain an affidavit from him, if the inmate is willing to give one, stating his grounds for relief with clarity."

14. *Compare* Proposed Reformation of Federal Habeas Corpus Procedure: Use of Federal Magistrates, 54 Iowa L.Rev. 1147 (1969). The Federal Magistrates Act provides that the duties the district judges may assign the Federal magistrate include "preliminary review of applications for posttrial relief made by individuals convicted of criminal offenses, and submission of a report and recommendations to facilitate the decision of the district judge having jurisdiction over the case as to whether there should be hearing." 28 U.S.C. § 636(b) (3) (Supp. V, 1970).

15. Mr. Jacob, a Research Associate, Center for Criminal Justice, Harvard Law School, is a former Assistant Attorney General of Florida. He is also a former member of the faculty of the Emory Uni-

The salient points are discussed in the concurring opinion of Justice Douglas in the 1969 opinion in Johnson v. Avery, cited above. In 1960 Justice Potter Stewart declared that he was not alone on the Court in hoping that legal assistance could be provided at the penitentiaries, that the courts "would be greatly aided in their work" through such assistance which would give reasonable assurance that the just claim would be presented more properly and clearly, and would help in eliminating the frivolous and irrelevant presentation.[16] A similar conclusion appears in a 1963 report of a Committee of the U.S. Judicial Conference,[17] and a 1967 report of a task force of the President's Crime Commission.[18]

In 1968 the American Bar Association adopted, as part of its project on Minimum Standards for Criminal Justice, the report on Post-Conviction Remedies prepared by its Advisory Committee on Sentencing and Review. Section 3.1 of the report, dealing with preparation of applications for post-conviction relief, recommends that the state should arrange, or at least permit—"inprison guidance or counselling of prisoners on the validity or invalidity of claims for post-conviction relief." Among the steps listed for consideration are "(1) regular visits by lawyers or law students to the prison to discuss cases or problems with prisoners on an individual basis, arranged by an independent agency such as a local bar association or defender association or law school."

The Commentary of this ABA report sets forth:

Relatively long periods of idleness and acute sense of grievance, and the hope that springs eternal in human breasts will combine to bring forth a host of applications from prisoners. In light of their own lack of legal sophistication, the prevalent absence of adequate legal reference material in prisons, the frequent severe administrative restrictions on prisoner access to the library, and the inevitable distortions in the minds of men evaluating their own cases, it is not surprising that a high percentage of the applications are groundless. * * * The optimal form of education would involve face-to-face interviews between prisoners and attorneys who could advise them of the probable merit or lack of merit in their grievances. * * * There is a probably valuable by-product in educating prisoners to realization of the legal insufficiency of their supposed grievances. Where prisoners believe that their failing to win relief is the result merely of inability to start the judicial machinery, a festering condition is created which could have a detrimental effect on rehabilitation programs and prison morale.

One source of professional manpower that might be used to meet the need of counsel for prisoners is the law student population.

In the District of Columbia counseling to prison inmates in regard to collateral attack on convictions and sentences may become available from the

---

versity School of Law, who supervised the Emory Legal Assistance for Inmates Program, which was initiated primarily to establish a law student assistance program providing interviewing and counseling service to inmates of the United States Penitentiary in Atlanta. The program expanded to render services to inmates of state and county prisons and jails in Georgia. Mr. Sharma, like Mr. Jacob, is a S.J.D. Candidate, Harvard.

16. Address at the Annual Meeting of the Legal Aid Society, 18 Legal Aid Review 3, at 7 (1960).

17. Habeas Corpus and Post Conviction Review (Report of the Committee on Habeas Corpus) 33 F.R.D. 363, 384–385 (1963).

18. Task Force Report, Corrections, President's Commission on Law Enforcement and Administration of Justice 84 (1967).

Public Defender Service, recently established by Congress as a successor to the D.C. Legal Aid Agency and expressly given authority to render aid with respect to collateral attack on convictions and sentences.[19] We note, for example, that in Minnesota, known for the excellence of its public defender system, the office of state public defender has been assigned this responsibility, trial representation being the function of the district public defenders.[20]

Use of law students to counsel and advise with prisoners, commended by the A.B.A. report, may well provide the key toward serving a need without excessive drain on community resources. Thus far none of the area law schools has any such program, though one has a program to provide legal assistance to inmates on their civil problems.[21]

The law schools of the country have found that counseling of prison inmates has not only achieved objectives in terms of improvement of administration of justice, but has given the students, who show strong motivation, "an extraordinary learning experience." [22] So wrote Professor Paul Wilson, an experienced trial lawyer who served as the faculty advisor of the first of these projects, wherein students at the University of Kansas Law School, under supervision, interview and counsel the inmates of Leavenworth Penitentiary. When Yale Law School recently began to provide aid to inmates of the Federal institution at Danbury, it became the 12th law school providing such assistance to prisoners at Federal institutions.[23]

Another eight law schools are listed as providing service to inmates of State institutions,[24] including the Harvard Legal Assistance project, established by the Center for Criminal Justice at Harvard, which is combining legal assistance with research into the range of prisoners' legal problems.

There are of course problems with these as with any other human program.[25] There is need for assuring effective supervision of the students. There may be a conflict between the service and educational purposes of the program.[26] Large penal institutions exhaust the capacity of the school that happens to be nearby.

Yet there are indications that such law student programs present a means, at modest cost, of furthering objectives of criminal justice. This includes indications that such programs do cut down the number of frivolous applica-

---

19. Public Law 91–358, 84 Stat. 473 (1970).

20. Jacob and Sharma, op. cit. *supra* note 13, at 602.

21. American University Law School offers a "Lawcor" course wherein students under the supervision of Professor Nicholas Kittrie and other lawyers, interview and counsel those in detention at Lorton Reformatory, or the Jail, on civil legal problems, e. g. divorce.

22. Paul Wilson, Legal Assistance Project at Leavenworth, The Brief Case, June 1966, pp. 254, 260.

23. The law schools presently providing student services (and the facilities) are: UCLA (Terminal Island) ; Emory (Atlanta) ; Florida State U. (Tallahasee) ; Indiana-Bloomington (Terre Haute) ; U. Kansas (Leavenworth) ; U. Michigan (Milan) ; U. of Missouri-Kansas City (Springfield) ; U. Pennsylvania (Lewisburg) ; U. Southern California (Lompock); Washington & Lee (Alderson) ; U. Washington (McNeil Island) ; Yale (Danbury). The University of Minnesota Law School students service Sandstone through the public defender. *See* Jacob & Sharma, op cit. *supra* note 13, at 499, and Appendix A. at 625.

24. *Id.*, also at 610–611.

25. Financial problems may be posed by the recent phasing out at the end of 1969 of the National Defender Project of the National Legal Aid & Defender Association. But New York obtained an LEAA action grant for this purpose. Jacob & Sharma, op. cit. *supra*, note 13, at 622–623, notes 726, 730.

26. Jacob & Sharma, op. cit. *supra* note 13 at p. 616.

tions.[27] They may also lead to the uncovering of more meritorious petitions.[28] Both trends are in the furtherance of our system of justice. And law school students can take on other aspects of counseling of inmates, beyond the scope of this opinion, which have been remarked as an overall contribution to the administration of justice.[29]

The role of the judicial system in furthering this kind of development remains a matter for future development. Court systems can provide at least the encouragement of allowing active participation at hearings by students, under supervision, and by other recognition of the program. The laboring oar, however, properly belongs to the administrative arm of the judicial system— the Judicial Council, the Judicial Conference, and their committees—in conjunction with the bar associations and area law schools.

\* \* \* \* \*

The present case will be remanded for proceedings not inconsistent with this opinion. Since counsel has been appointed by this court, such counsel is instructed to consult with petitioner and aid him in preparation for further proceedings. The District Court is requested to permit counsel to represent petitioner in further proceedings.

So ordered.

BAZELON, Chief Judge (concurring):

I join in Part I of the court's opinion on my understanding that it leaves no alternative for the district court judge in this case but to hold an evidentiary hearing promptly. Since petitioner's assertions have been found to be neither conclusory nor "palpably incredible," and since petitioner will be represented by counsel to aid and advise him in the presentation of his case, the possible justifications for an additional hurdle before the hearing are gone.

I share wholeheartedly the concern manifested in Part II of the court's opinion that some means be found to provide adequate legal assistance for prison inmates who wish to attack their sentences collaterally.

---

27. Jacob & Sharma, op. cit. *supra* note 13, at pp. 520–1 (referring to experience at New Jersey and Kansas).

An inmate otherwise ready, in the absence of professional guidance, to draw freely for his allegations on the wording of a favorable opinion or winning pleading, might well come to realize in the course of answering questions of his legal advisor probing the facts of his case and the evidence available, that his proposed course would at best be short-lived and futile, and might even lead him into difficulties.

28. Jacob & Sharma, op. cit. *supra* note 13, at p. 521, projecting that success rate may go up to 10% of petitions filed.

29. The Task Force on Corrections, *supra* note 18, comments (at p. 85) concerning prison legal aid programs: "Such programs can, moreover, help indigent inmates with meritorious claims present those claims to correctional authorities as well as to courts, and could be instrumental in helping develop better protective procedures within corrections."

One aspect of inmate counselling is illustrated by the highly successful law student program at the University of South Carolina Law School, where the students give actual representation to convicts at parole eligibility hearings.

The prison legal aid programs established at law schools have depended in great measure on cooperation with correctional authorities. The U.S. Bureau of Prisons has been notable in this regard. *See* article by its Chief Counsel, Barkin, Impact of Changing Law upon Prison Policy, 48(I) Prison J. 47 (1968). These relationships can be strained when the legal aid program takes on court action representing inmates against prison officials for violation of rights, even when this is done on court assignment. *See* Jacob & Sharma, op. cit. *supra* note 13 at 620, referring to instance when faculty supervisor of Emory Law School project was appointed by U.S. District Court in Atlanta to represent inmates complaining of Atlanta prison officials, *see* White v. Blackwell, 277 F.Supp. 211 (N.D.Ga.1967), Lawrence v. Blackwell, 298 F.Supp. 708 (N.D.Ga.1969).

The literature refers to rehabilitation benefits from counseling provided prisoners on problems not involving the criminal justice system, e. g. family relations problems. *See* note 21 *supra*.