The **DEMOCRATIC CENTRAL COMMITTEE et al., Petitioners,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

**D. C. Transit System, Inc., Intervenor.**

No. 22450.

United States Court of Appeals, District of Columbia Circuit.

Argued July 23, 1970.

Decided June 28, 1973.

---

57. *Supra* note 306.

Landon G. Dowdey, Washington, D. C., with whom S. David Levy, Neil J. Cohen and John W. Karr, Washington, D. C., were on the brief, for petitioners.

Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Harvey M. Spear, New York City, for intervenor.

Before ROBINSON and Mac-KINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This petition challenges two orders of the Washington Metropolitan Area Transit Commission by which D. C. Transit System, Inc. (Transit) was empowered to temporarily increase certain of its fares for transportation of passengers in the District of Columbia and its Maryland suburbs. In the first order, No. 880,[1] the Commission concluded that Transit needed an upward adjustment of fares to avoid heavy financial losses during a 44-day period; and in the second, No. 882,[2] the Commission set fares cal-

---

* Sitting by designation pursuant to 28 U.S. C. § 293(a) (1970).

1. D. C. Transit Sys., Inc. (Order No. 880) (WMATC Oct. 18, 1968) (unreported).

2. D. C. Transit Sys., Inc. (Order No. 882) (WMATC Oct. 29, 1968) (unreported).

culated to produce additional revenues in that period. After careful study of petitioners' contentions against the backdrop of the administrative record, we perceive no error in the Commission's action. We accordingly affirm the orders under review.

## I

On July 17, 1968, Transit filed an application seeking approval of increases, to become effective August 18, in some of its fares within the District of Columbia and Maryland, and between points in those areas, as specified in revised tariffs accompanying the application.[3] On August 15, the Commission suspended the tariffs pending its investigation into the reasonableness of the proposed fares [4] and thereafter, between August 26 and September 13, conducted a series of public hearings at which that matter was extensively explored.[5] On October 18, the Commission issued Order No. 880 in which it identified the circumstance which became crucial to its resolve to permit a fare raise. The Commission found that Transit had lost some $880,000 during the first seven months of 1968 and that, at the existing fares, it would lose almost $2.8 million more in the future annual period.[6] On that basis, the Commission concluded that the fares in force were unjust and unreasonable, and that an increase was imperative.[7]

3. See Franchise Act § 7, 70 Stat. 598 (1956); Washington Metropolitan Area Transit Regulation Compact, tit. II, art. XII, §§ 5(a), 6(a) (Compact). The Compact is incorporated into Pub.L. No. 86–794, 74 Stat. 1031 (1960), and, with amendments, is set forth following D.C. Code §§ 1–1410, 1–1410a (1967). See also D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 151 U.S.App.D.C. 223, 233–236, 466 F.2d 394, 404–407, cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

4. See Compact, *supra* note 3, tit. II, art. XII, §§ 5(e), 6(a); D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, 151 U.S. App.D.C. at 233–234, 466 F.2d at 404–405. The tariffs were originally suspended until October 1. D. C. Transit Sys., Inc. (Order No. 854) (WMATC Aug. 15, 1968) (unreported). To afford additional time for Commission consideration, the suspension was later extended to October 14. D. C. Transit Sys., Inc. (Order No. 876) (WMATC Sept. 30, 1968) (unreported). Presumably the old fares remained in force between the latter date and October 18, the date of Order No. 880.

5. Formal hearings were held on four separate days. An additional evening session was held to allow interested persons other than parties to express themselves. There were seven formal protestants, including petitioner Democratic Central Committee, and 33 other persons expressed views for themselves or their organizations at the evening session. The record contains a transcript of 1,025 pages and 32 exhibits.

6. Largely because of a sharp drop in ridership during the spring and early summer of 1968, Transit sustained losses from January through July, 1968, of $882,651.-58. D. C. Transit Sys., Inc. (Order No. 880), *supra* note 1, at 7. The Commission found that if fares remained unchanged, Transit's annual revenue would increase by $384,124, but that its annual expenses would increase by $3,379,545, and that in the future annual period— ending July 31, 1969—Transit's losses would aggregate almost $2.8 million. *Id.* at 20–22. The Commission also found that a fare structure which would produce a return to investors of $746,682 would be fair and reasonable, *id.* at 34–36, although, as will be seen, neither of the orders under review made provision for a return on equity. See text *supra* at note 15.

7. The Commission reached the "inescapable conclusion that the existing fares [were] unjust and unreasonable, in that they [would] not produce revenues sufficient to enable the company even to meet its expenses." *Id.* at 22–23. The Commission also concluded that unless sufficient revenues were generated to enable Transit to meet operating expenses and debt service, it "would simply . . . invite a deterioration in the quality of service . . . [and] precipitate an eventual transportation crisis with unjustifiable hardship for the riding public." *Id.* at 40–41. With new legislation providing $1.1 million more than originally anticipated for Transit's schoolfare subsidy, the Commission found that a fare structure producing additional farebox revenues of $1,715,801 would be fair and reasonable. *Id.* at 45–50.

It so happened, however, that ten days prior to Order No. 880 our *Williams*[8] and *Payne*[9] decisions were announced. In *Williams*, we set aside two of Transit's fare orders and remanded several issues for further consideration by the Commission, some of which envisioned the posibility that Transit would have to make restitution of sizable sums to its riders.[10] In *Payne*, we upheld fares erected by two other orders but remanded for additional study an issue as to whether Transit's fare scheme was discriminatory.[11]

In Order No. 880, the Commission felt that, as far as possible, it should take those decisions into account before disposing of the proceeding before it,[12] and to the limited extent deemed feasible it undertook to do so.[13] The Commission also felt, however, that most of the *Williams-Payne* remands required study extending beyond the time at which Transit should obtain some relief.[14] Considering, on the one hand, that the inadequacy of Transit's current fares necessitated higher fares and, on the other hand, that Transit might have to refund a substantial sum to the traveling public, the Commission concluded that it would be appropriate to raise Transit's fares enough to enable it to cover its operating expenses and debt service but, pending completion of its studies of the remanded issues, not a return on equity.[15] Since the tariffs filed by Transit expectably would yield revenues above that point, Order No. 880 set another public hearing at which interested parties might submit proposals for a fare structure that would generate revenues at the break-even level.[16]

The supplemental hearing was held on October 25, and four days later Order No. 882 issued. It prescribed, on an interim basis, fare raises designed to absorb Transit's operating expenses and debt service but not to accommodate any return on equity.[17] The interim period extended through December 13, the 120th day after Transit's new tariffs were first suspended—the maximum period the Commission was authorized to suspend a tariff.[18] In this fashion the Commission, consistently with the approach adopted in Order No. 880, held the line on profit-making while it dealt with the issues committed to it by the remands.

Petitioners sought reconsideration of Orders Nos. 880 and 882 on grounds which included those later discussed herein. On October 31, the application for reconsideration was denied,[19] and

8. Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 342, 415 F.2d 922 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). See also Bebchick v. Washington Metropolitan Area Transit Comm'n, No. 23,720, 158 U.S.App.D.C. ——, 485 F.2d 858 (1973).

9. Payne v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 321, 415 F.2d 901 (1968).

10. Williams v. Washington Metropolitan Area Transit Comm'n, *supra* note 8, 134 U.S.App.D.C. at 396–397, 415 F.2d at 976–977.

11. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S. App.D.C. at 342, 415 F.2d at 922.

12. D. C. Transit Sys., Inc. (Order No. 880), *supra* note 1, at 37–38.

13. *Id.* at 41–43.

14. *Id.* at 40–41.

15. *Id.* at 43–45.

16. *Id.* at 52.

17. D. C. Transit Sys., Inc. (Order No. 882), *supra* note 2, at 9–10. There is no question as to the Commission's power to promulgate an interim fare order. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S. App.D.C. at 326, 415 F.2d at 906.

18. Compact, *supra* note 3, tit. II, art. XII, § 6(a)(2). See also Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S.App.D.C. at 327–329, 415 F.2d at 907–908.

19. D. C. Transit Sys., Inc. (Order No. 894) (WMATC Oct. 31, 1968) (unreported). For a discussion of orders which shortly followed, see Yohalem v. Washington Metropolitan Area Transit Comm'n, 141 U.S.App.D.C. 17, 19–21, 436 F.2d 171, 173–175 (1970).

the petition for review by this court followed.

## II

Petitioners' first complaint is that Orders Nos. 880 and 882 reflect a failure by the Commission to give *Williams* [20] and *Payne* [21] the consideration and respect they were due. The grounds tendered in support of this position are several. Petitioners charge that the Commission was preoccupied with Transit's cash flow predicament, and gave only superficial attention to the substantial benefits accruing to the busriding public in consequence of those decisions. Petitioners argue that substantial sums of money were due farepayers in consequence of *Williams*,[22] and these sums, it is stated, would offset any loss which Transit might suffer for want of a more immediate fare increase.[23] Petitioners suggest that, since when the decisions were rendered two months of the statutory suspension period [24] remained, the Commission acted too hastily in not utilizing that time for a more careful inquiry. Petitioners contend further that there were explanations for Transit's chronic cash shortages which the Commission might have profitably explored, but which, they assert, the Commission chose instead to ignore.[25] Petitioners also point out that the orders were formulated without the study called for by our remand in *Payne,* and that, they say, was error.

Our starting point is the Commission's decision itself. Confronted, in the midst of its investigation of Transit's application for a fare increase, with the *Williams* and *Payne* decisions, the Commission perceived three courses available to it:

> One option open to us is to take no action in this case between November and December 13, 1968, the date by which we are required to act. . . . The substantial losses being suffered by the company daily make that possibility unwise. Another option would be to ignore the court opinions until the cases are officially remanded to us and decide this case as though they had never been handed down. We regard the opinions as being entitled to more consideration than that. Finally, there is the option we choose to follow—to take interim action in this case while we await developments resulting from the court decisions.[26]

Elucidating this choice, and addressing the question whether the prospect of a refund pursuant to *Williams* should impact an interim increase, the Commission said:

> We do not know at the present time how much will ultimately be placed in the riders' fund. There are many complex questions to be resolved and we are disinclined to dispose of them precipitately. Meanwhile, the evidence in this case, which is practically

20. *Supra* note 8.

21. *Supra* note 9.

22. Petitioners claim the amount due is at least $1.5 million, and could range to $4,000,000. See Bebchick v. Washington Metropolitan Area Transit Comm'n, No. 23,720, 158 U.S.App.D.C. at ——, n. 137, 485 F.2d at 875, n. 137 (1973).

23. A similar prediction is made with respect to rider-reimbursement which was expected from Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. ——, 485 F.2d 786 (1973). That claim is to a possible refund perhaps several million dollars more than the *Williams* refund. See note 22, *supra.*

24. See text *supra* following note 16.

25. These, petitioners aver, include transfers of valuable real estate from operating status to an investment status on Transit's books, see Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 23, expenditures for purposes unrelated to operation of Transit's mass transportation system, large net cash balances due Transit from its affiliated companies, and large dividends paid by Transit to its investors.

26. D. C. Transit Sys., Inc. (Order No. 880) *supra* note 1, at 37–38.

undisputed, makes it perfectly clear that the revenues being produced by the present fare structure will fall far short of covering operating expenses and debt service in the future annual period, much less provide a profit for the owners. Continued operations in this state of affairs could at some point drive the company to the point where it is simply unable to continue to operate.

We find our answer to this dilemma in one fact. Even if we knew with precision right now the amount to be placed in the riders' fund, we would not consider it wise policy to apply that fund in such a manner as to reduce revenues below the level of operating expenses and debt service. To do so would simply be to invite a deterioration in the quality of service, to impair our ability to require service improvements, and to precipitate an eventual transportation crisis with unjustifiable hardship for the riding public. We are saying, in other words, that the wisest use of the riders' fund is to eliminate return to the equity holders until such time as full restitution is made of the amounts which the court has held were improperly obtained from the riding public.

This being so, it is entirely consistent with the court's decision to issue an interim decision in this case whch makes those changes in the rate structure which are necessary in order to produce revenues sufficient to cover operating expenses and debt service while we consider what further action is required in light of the court opinions.[27].

With respect to the study directed in *Payne,* the Commission felt that

   . . . the court's approval of our interim [o]rder . . . in [*Payne*] lends support to our view of this problem. The court has clearly expressed its own concern with the deleterious consequences of forcing the company to operate at a loss and has recognized our power to deal with the problem on an interim basis.[28]

The Commission's reference to *Payne* brings to mind what we said there:

   The case will therefore be remanded to enable the Commission to conduct [the required] study. We wish to make clear, however, that we do not view our holding in this regard as requiring that the rate increases ordered by the Commission be rescinded, and we leave the matter of any immediate fare adjustments to the Commission's discretion. For though we have rejected the Commission's reasons for refusing to inquire further into the question of fare discrimination, we do not think the circumstances required that the rate increases requested by Transit be delayed until such an inquiry could be made. We note especially that considerable time had already been expended in the Commission's effort to deal conscientiously with the fair return issue, and that, as found by the Commission's Interim Order, Transit had urgent need for higher fares. Moreover, though the issues raised by petitioners were, in the context of the Commission's past regulatory practice, novel and far-reaching, they were not raised until the final stages of the proceeding. For these reasons we think the Commission, balancing the possibility of unfairness to particular customers or classes of customers against the company's immediate need for increased revenues, might have deferred consideration of the questions relating to discrimination while granting Transit's request for a fare increase. And we hold that it is within the Commission's discretion to follow that course on remand.[29]

We turn now to examine petitioners' objections to the Commission's disposition of the matter. We need not consider whether the Commission's reasoning

---

27. *Id.* at 40–41.

28. *Id.*

29. 134 U.S.App.D.C. at 341–342, 415 F.2d at 921–922 (footnotes omitted).

would support a permanent higher-fare order promulgated under circumstances conducive to deliberate action,[30] for the context of Orders No. 880 and 882 clearly was not of that character. Rather, it closely paralleled the milieu which we discovered in *Payne*. There, like here, the Commission had made an unchallenged finding that Transit would sustain a large net operating loss at then prevailing fares.[31] There, like here, the deficit would have jeopardized Transit's financial health, and in consequence would have threatened a deterioration in the quality of its service.[32] And there, like here, the Commission issued an interim break-even order because formulation of a permanent order would have required a considerable amount of time.[33] We sustained the order against the contention that the findings underlying it were inadequate.[34] We held that the Commission

> . . . was not required to make the full and complete findings as to margin of return and fare structure that must accompany an exercise of its authority to prescribe permanent rates. This is not to say that its discretion must not be exercised rationally, nor that it may act without making relevant findings, supported by the record, to sustain its action. We hold, however, that given the circumstances presented here—the inadequacy of the record and the need for further in-

quiry, the danger of serious consequences to Transit and the public if no fare increase were granted in the interim, and the undesirability of imposing unreasonably high fares on the public—the Commission's solution was within the bounds of its authority and supported by the findings it made.[35]

In the present case, as we have stated, the Commission found that existing fares were unjust and unreasonable because Transit had already lost more than $880,000 within a seven-month era and stood to lose almost $3 million more during the future annual period.[36] Not in the least are these stark facts disputed by petitioners;[37] their position is that the deficit could have been absorbed without resort to a fare raise.[38] But as the Commission emphasized, "[c]ontinued operations in this state of affairs could at some point drive the company to the point where it is simply unable to operate;"[39] and to deny Transit sufficient revenues to meet its operating expenses and pay interest on its debt obligations "would simply be to invite a deterioration in the quality of service, to impair [the Commission's] ability to require service improvements, and to precipitate an eventual transportation crisis with unjustifiable hardship for the riding public."[40]

The great difficulty, from the Commission's viewpoint, was that delay in affording Transit some measure of re-

30. See Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 19, 141 U.S.App.D.C. at 26, 436 F.2d at 180.

31. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S. App.D.C. at 325, 415 F.2d at 905.

32. *Id.* at 325–326, 415 F.2d at 905–906.

33. *Id.* at 326, 415 F.2d at 906. The time problem in *Payne* was occasioned by the condition of the administrative record, which did not provide a sufficient basis for determining whether the fares proposed by Transit would be just and reasonable. *Id.*

34. *Id.* at 325–327, 415 F.2d at 905–907.

35. *Id.* at 327, 415 F.2d at 907.

36. See note 6, *supra*.

37. In that regard, the Commission said: Indeed, for the first time in our experience, the formal parties (*i. e.*, the company, the Commission Staff and the three protestants) are all in substantial agreement on the revenue and expense projections. These projections show beyond question that under the present fare structure, the company will not receive sufficient revenues during the year ending July 31, 1969, to pay the operating expenses and interest charges which it will incur.
D. C. Transit Sys., Inc. (Order No. 880), *supra* note 1, at 3–4.

38. See text *supra* following note 21.

39. See text *supra* at note 27.

40. See text *supra* at note 27.

lief was incompatible with the interests of the carrier and the traveling public. Although it was probable that Transit's busriders were entitled to refunds under our decision in *Williams,* the Commission, in Order No. 880, pointed out that it did "not know at the present time how much will ultimately be placed in the riders' fund,"[41] and that "[t]here are many complex questions to be resolved and we are disinclined to dispose of them precipitately."[42] Quite understandably, then, the Commission felt that "the wisest use of the riders' fund is to eliminate return to the equity holders until such time as full restitution is made of the amounts which the court has held were improperly obtained from the riding public."[43]

In addition to the time needed to work out the problem of possible restitution which *Williams* posed for the Commission, time was also needed for Transit to seek review of that decision. When Order No. 880 issued, the Commission knew that Transit had already asked this court for a stay of the mandate.[44] We granted the requested stay, and Transit applied to the Supreme Court for certiorari.[45] As we were later to observe, the "issue [before the Commission] was hedged with uncertainty because of the pendency of the petition for certiorari in *Williams,* and . . . the course of action urged by petitioner might well have resulted either in the transit stoppage which the Commission was seeking to avoid, or in another series of complex legal problems."[46] We

also are advertent to the fact that the interim increase under review was to endure for only 44 days, and that the Commission had already begun preparation for responding to the *Williams* and *Payne* remands.[47] We perceive no basis for overhauling the Commission's judgment that postponing relief for Transit until these efforts had run their course was not in the best interests of either the carrier or its passengers.[48]

For similar reasons, we believe the Commission remained well within its regulatory authority when it selected the interim increase in preference to deferment of relief pending the study for which we remanded in *Payne.* It had to be fairly evident to all concerned that a good deal of time would be required for the study which *Payne* envisioned—perhaps more time than stable fares beset by rising costs could bear. Indeed, in our *Payne* opinion, we explicitly committed to the Commission's discretion the question whether the fare increase there authorized should be stayed until the study was made.[49] In Order No. 880, the Commission correctly read this action as an expression of "concern with the deleterious consequences of forcing the company to operate at a loss,"[50] and as a recognition of the Commission's "power to deal with the problem on an interim basis."[51] As the Commission added,

The court's views on this problem make it perfectly clear that, without denigrating the importance of the cost study, a clear showing of need lays

---

41. D. C. Transit Sys., Inc. (Order No. 880), *supra* note 1, at 40.

42. *Id.*

43. *Id.* at 41.

44. *Id.* at 37.

45. The Court denied the writ. 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

46. Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 19, 141 U.S.App.D.C. at 27, 436 F.2d at 181.

47. See D. C. Transit Sys., Inc. (Order No. 880), *supra* note 1, at 41–44.

48. For the same reason—the delay involved, and the consequences of delay—we reject the contention that an interim fare increase should have been denied in favor of other alternatives said to have been open to the Commission. See note 25, *supra,* and accompanying text.

49. See text *supra* at note 29.

50. D. C. Transit Sys., Inc. (Order No. 880), *supra* note 1, at 41.

51. *Id.*

the foundation for fare adjustments on an interim basis prior to completion of the cost study. We find that the financial situation of the company . . . does establish a need for action now.[52]

We have no cause to disturb that finding. We hold that the Commission did not exceed its power or its discretion in declining to defer temporary relief for Transit in favor of completion of the remands in *Williams* and *Payne*.

## III

The projections underpinning the fares authorized by Order No. 882 included $35,695,256 in passenger revenue, exclusive of the schoolfare subsidy, and $34,367,584 in operating expenses.[53] As in other ratemaking proceedings,[54] the Commission was sensitive to the phenomenon that higher fares are normally accompanied by a proportionate drop in ridership,[55] and it had good reason to be.[56] Petitioners argue with declining ridership comes declining cost of operation, and that the Commission failed to match the two in setting the new fares.

At the hearings, the protestants presented a witness who expressed the view that Transit's request for higher fares omitted recognition of savings that could result from a reduction in service made possible by the expected fall in ridership.[57] The witness thought that maintenance costs might be lowered and some trips eliminated,[58] but the Commission disdained these suggestions. "Reducing the level of maintenance," it said, "will only result in a lessening of the caliber of vehicle on the streets. . . . We feel that Transit's maintenance efforts in the future should be expanded, not restricted"[59] Moreover, the Commission added, "fare resistance does not show up on one particular trip or even one particular line. Such resistance is general in nature and in practically every instance takes place throughout the system rather than on a particular trip or line."[60] Thus the Commission felt that there was no significant relationship between the projected decline in Transit's ridership and the expenses of operating Transit's system. Petitioners contend that the Commission, in doing so, accorded too little weight to the witness' testimony.

52. *Id.* at 44.

53. D. C. Transit Sys., Inc. (Order No. 882), *supra* note 2, at 8.

54. *E.g.*, Powell v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App. D.C. —— at —— n. 17, 485 F.2d 1080 at 1083, n. 17 (1973).

55. "We know the degree of price elasticity which prevails in the case of fare *increases*. There is a loss of .25% of riders for each 1% increase in fares. This is a relatively inelastic demand." D.C. Transit Sys., Inc. (Order No. 882), *supra* note 2, at 17 (emphasis in original).

56. Transit's ridership did fall with the advent of higher fares. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App. D.C. —— at —— & nn. 201–203, 485 F.2d 786 at 808–809 & nn. 201–203 (1973).

57. By the Commission's characterization, to which all parties subscribe, the witness' testimony was that Transit had failed to give recognition to savings which would emanate from the reduction in service, made possible by those passengers resisting the fare increase. When pressed as to what specific variable costs he had in mind, he replied that he was not familiar enough with the industry or this particular company to pin-point them precisely. However, he did reveal that he thought maintenance costs could be reduced and that some trips could be eliminated.

D. C. Transit Sys., Inc. (Order No. 880), supra note 1, at 23.

58. See note 57, *supra.*

59. D. C. Transit Sys., Inc. (Order No. 880) *supra* note 1, at 23.

60. *Id.* at 24. There are also indications in the record that in any event Transit's rising expenses would so far outpace the decrease in ridership that service curtailments could not possibly keep abreast. *Id.* at 15–17.

■ In exercising its ratemaking function, the Commission was under an obligation to take into account any economies that the carrier could effect, and any that were probable from a decreased ridership.[61] We do not, however, regard the Commission's rejection of the witness' testimony as a default on that score. The witness admitted that he was too unfamiliar with the industry and with Transit as a carrier to pinpoint specific costs which might drop with a drop in the number of riders;[62] his observations concerning maintenance and service cutbacks were voiced simply as suggestions.[63] The Commission bore a responsibility, coequal with the responsibility to hold fares down, to sustain the efficiency and adequacy of Transit's service.[64] Reduced maintenance and fewer trips are obviously inconducive to superior transportation.

Beyond that, the broad thesis that a smaller ridership for Transit is wedded to smaller operating costs for Transit was disputed before the Commission. Another witness, Transit's senior vice president in charge of operations, testified that any ridership decline occasioned by resistance to higher fares would, as the Commission said,[65] be likely to be diffused over the entire transportation system—a few passengers less per trip, but not fewer enough to enable curtailment of the frequency of trips on any given route. The witness further testified that Transit's constant traffic checks had not disclosed any loss of passengers sufficiently concentrated to justify any substantial reduction in service.[66]

Were this all to the matter, we would be obliged to accept the Commission's action, for the choice between particular items of conflicting evidence on issues within the Commission's area of expertise was peculiarly one for it to make.[67] We would be justified in upsetting the choice only if it were irrationally made,[68] and, measured simply by the testimony of the two witnesses, that would not be the case here. As we said in *Payne*, "it is not a valid objection that conflicts of the evidence might conceivably have been resolved differently, or other inferences drawn from the same record." [69]

■ But the inquiry is not necessarily ended by the Commission's pick from the conflicting testimony of the two witnesses, for there would remain the question whether the Commission should

---

61. Compare Bebchick v. Public Utils. Comm'n, 115 U.S.App.D.C. 216, 222, 318 F.2d 187, 193 (en banc), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963), where we set aside a permanent fare increase because the Commission failed to take into account economies possible through coordination of Transit's track removal program with the street repaving plans of the District of Columbia.

62. See note 57, *supra*.

63. See note 57, *supra*.

64. See D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3.

65. See text *supra* at note 60.

66. As we observed in Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 19, 141 U.S.App.D.C. at 25, 436 F.2d at 179:

As a general matter, it seems clear that variable costs are linked to ridership only insofar as changes in the level of patronage make increases or decreases in the level of service desirable; at least, it is difficult to see how the company will save money if it is running the same schedules over the same routes, but with fewer total passengers than normal.

67. *E.g.*, D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, 151 U.S.App.D.C. at 243, 466 F.2d at 414.

68. *Id.*; NLRB v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); NLRB v. J. M. Mach. Corp., 410 F.2d 487, 490 (5th Cir. 1969).

69. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S.App.D.C. at 334, 415 F.2d at 914. Accord, D. C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 3, 151 U.S.App.D.C. at 243, 466 F.2d at 414.

have probed deeper before coming to a conclusion. Surely if Orders Nos. 880 and 882 had established higher fares on a permanent basis, the Commission's treatment of the relationship between cost savings and proper fares might not pass muster.[70] We think, however, that in the circumstances confronting the Commission, there was ample basis for what it did here.

We have already pointed out that in fashioning interim orders the Commission "was not required to make the full and complete findings . . . that must accompany an exercise of its authority to prescribe permanent rates."[71] True it is that "its discretion must . . . be exercised rationally,"[72] and it must make "relevant findings, supported by the record, to sustain its action."[73] But the important point is that the action which must be sustained here is not the specific treatment of particular ratemaking factors—that is, not the treatment as a treatment on the merits—but rather the propriety of granting interim relief pending fuller consideration of the fare-increase application on the merits.[74] So measured, Orders Nos. 880 and 882 survive the test.

In Yohalem v. Washington Metropolitan Area Transit Commission,[75] we dealt with a cognate problem. There, similarly to the situation here, an order fixing higher permanent fares[76] was challenged on grounds that the Commission had failed to adequately weigh the possibility that variable costs would drop with a dropping ridership, and that it had failed to explore service cutbacks and other alternatives before raising the fares.[77] We held that the Commission was not required to delve into those matters prior to promulgation of the orders there under attack.[78] We noted that "an inquiry into the relationships among costs, ridership levels, and service cutbacks raises a host of complicated factual questions,"[79] which the Commission would have had to investigate de novo[80] and at a time when "the status quo placed D. C. Transit in an intolerable financial position."[81] We observed that "it would be a strange interpretation of the public interest which encompassed the likelihood that the Commission would be holding hearings on the issue of whether some routes had become sufficiently unprofitable to warrant cutbacks in service, while creditors forced the company into a total shutdown."[82] We declared, too, "that considerations of administrative efficiency required that the questions concerning possible service reductions be resolved in a context more conducive to unhurried and informed deliberation than the crisis atmosphere which prevailed in the instant proceedings."[83]

It goes without saying that what suffices for a permanent fare order does equal service for an order setting fares just for the limited time required for a full examination of critical aspects of a fare application on the merits. The conditions prevailing when Orders Nos. 880 and 882 were fashioned were no less

70. See Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 19, 141 U.S.App.D.C. at 26, 436 F.2d at 180.

71. See text *supra* at note 35.

72. See text *supra* at note 35.

73. See text *supra* at note 35.

74. See, *e.g.*, Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S.App.D.C. at 325–327, 415 F.2d at 905–907.

75. *Supra* note 19.

76. D. C. Transit Sys., Inc. (Order No. 900) (WMATC Dec. 1968) (unreported),

aff'd, Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 19.

77. Yohalem v. Washington Metropolitan Area Transit Comm'n, *supra* note 19, 141 U.S.App.D.C. at 26, 436 F.2d at 180.

78. *Id.* at 26–27, 436 F.2d at 180–181.

79. *Id.* at 26, 436 F.2d at 180.

80. *Id.*

81. *Id.*

82. *Id.*

83. *Id.* at 27, 436 F.2d at 181.

pressing than those existent when the orders addressed in *Yohalem* and *Payne* were promulgated. As the record before us vividly portrays, there was, as in *Yohalem,* "the serious threat of emergency"[84] consisting, as both there and in *Payne,* in "the danger of serious consequences to Transit and the public if no fare increase were granted in the interim. . . ."[85] And no more here than in those cases can we say that the Commission erred in granting Transit a raise enabling it to break even on its operations for the 44-day interim period.

The orders presently under review are accordingly

Affirmed.

---

84. *Id.* at 27, 436 F.2d at 181.

85. Payne v. Washington Metropolitan Area Transit Comm'n, *supra* note 9, 134 U.S.App.D.C. at 327, 415 F.2d at 907.