**Leonard S. GOODMAN, Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA et al., Appellees.**

**No. 73–1345.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1974.

Decided March 25, 1974.

---

Leonard S. Goodman, pro se.

Carl D. Hobelman, New York City, of the bar of the Court of Appeals of New York, pro hac vice by special leave of Court for appellee, Potomac Electric Power Co. Cameron F. MacRae, New York City, Stephen A. Trimble and George W. Warlick, Washington, D. C., were on the brief for appellee, PEPCO. Edward A. Caine, Washington, D. C., also entered an appearance for appellee, PEPCO.

C. Belden White, II, Asst. Corp. Counsel, Washington, D. C., for the District of Columbia, with whom C. Francis Murphy, Corp. Counsel, Washington, D. C., was on the brief, for Public Service Commission of the District of Columbia.

Before BAZELON, Chief Judge, TAMM, Circuit Judge, and WYZANSKI,* United States Senior District Judge for the District of Massachusetts.

TAMM, Circuit Judge:

This is an action under §§ 43–704 to 43–710 of the District of Columbia Code challenging an order of the Public Service Commission of the District of Columbia (hereafter "Commission") granting the Potomac Electric Power Company (hereafter "Pepco") an increase in rates. The matter first came before the District Court in October, 1970, and was dismissed on procedural grounds without prejudice. This court subsequently reversed and remanded for consideration

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

on the merits.[1] The District Court again affirmed the Commission and dismissed the complaint.[2] Appellant Goodman brings this appeal, and, for the reasons stated below, we affirm.

## I. BACKGROUND

On February 27, 1969, Pepco filed an application with the Commission for permission to increase its rates for electric service in the District of Columbia. Prior to hearings on the requested rate increase, Pepco filed an emergency application for an interim rate increase. The emergency application was deferred by the Commission[3] and the two applications were consolidated for hearings.

The Commission then held extensive hearings on Pepco's applications and numerous intervenors[4] gave the Commission the benefit of their views. Appellant Goodman chose not to intervene nor otherwise participate in hearings before the Commission.[5] The Commission ordered an interim rate increase,[6] without comment on the issues here under review. This order is not challenged by appellant.

On April 15, 1970, the Commission issued Order No. 5429[7] directing Pepco to file proposed rate schedules which would increase its annual gross operating revenues within the District of Columbia by $10,220,788.[8] Such an increase in revenues was based on 1) a determination that $854.3 million was the proper rate base on which Pepco should be allowed a fair rate of return; and 2) that Pepco should earn 7.1% on this rate base.

On May 14, 1970, appellant filed a Petition for Reconsideration[9] of Order No. 5429 which was denied by the Commission in its Order No. 5434.[10] Appellant then filed his complaint and petition of appeal in the District Court. After certain procedural difficulties were overcome,[11] the District Court affirmed the Commission in all respects and appellant brought the case before us.

## II. SCOPE OF REVIEW

Appellant seeks review of Order No. 5434 pursuant to 43 D.C.Code § 706 (1973) which provides:

§ 43–706. Appeal limited to questions of law.

In the determination of any appeal from an order or decision of the Commission the review by the court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

1. Goodman v. Public Service Commission, 151 U.S.App.D.C. 321, 467 F.2d 375 (1972).

2. Goodman v. Public Service Commission, Civil Action No. 1777–70 (D.D.C. filed January 22, 1973) ; J.A. at 15–24.

3. Interim Order No. 5402, October 27, 1969.

4. Intervenors participating included: General Services Administration for the United States Government; Washington Gas Light Company; D.C. City-Wide Consumer Council; The Washington Urban League; Arlington County Board; Capitol Group Ministry, Inc.; United Planning Organization; Consumer Council, CHANGE, Inc.; Mr. David Blanken, *pro se*; and Safeway Stores, Inc. Order No. 5429 at 3; J.A. at 80.

5. Appellant sought reconsideration of the Commission's order approving the rate increase. 43 D.C.Code § 704 (1973) requires a party desiring judicial review to seek reconsideration as a prerequisite to jurisdic-

tion in the District Court. We note that Section 43–704 requires only that one seeking reconsideration have been "affected by" the Commission's action; he need *not* have been a party to the proceedings which he now wishes to challenge. *Compare* Federal Power Act, 16 U.S.C. § 825*l*(a) (1970) *and* The Natural Gas Act, 15 U.S.C. § 717r(a) (1970), which limit access to reconsideration and judicial review to those who were parties to the agency proceeding.

6. Order No. 5419, January 30, 1970.

7. J.A. at 78–123.

8. This figure was reduced to $9,103,156 by Order No. 5434, June 12, 1970; J.A. at 138.

9. *See* n. 5 *supra*.

10. June 12, 1970; J.A. at 124–41.

11. *See* Goodman v. Public Service Comm'n, *supra* n. 1.

Clearly, review under § 43–706 is limited to questions of law, with the Commission's findings of fact deemed conclusive unless found to be "unreasonable, arbitrary, or capricious." D.C. Transit System, Inc. v. Public Utilities Comm'n, 110 U.S.App.D.C. 241, 292 F.2d 734, 735 (1961). In Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 188 F.2d 11 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951), this court, per Bazelon J., held that the Commission's authority to regulate rates is identical to the authority of the Federal Power Commission to set rates under the Natural Gas Act. It was there stated:

> Section 43–301 of the District of Columbia Code provides that ". . . The charge made by any . . . public utility for any facility or services furnished, or rendered, or to be furnished or rendered, shall be *reasonable, just and nondiscriminatory*."

> This statutory standard, taken together with the limitation of our review to "questions of law" and to findings of fact only if they are "unreasonable, arbitrary, or capricious", invests the District of Columbia Public Utilities Commission with the same broad authority as is possessed by the Federal Power Commission under the Natural Gas Act. The Supreme Court has said that that Commission is "not bound to the use of any single formula or combination of formulae in determining rates", so long as the "total effect," "impact" or "end result" of the rate order "cannot be said to be unjust or unreasonable." The limits set by the Court are deliberately broad, resulting both from notions of special competence and the conception of rate-making as a primarily legislative process. So long as the public interest—i. e., that of investors and consumers—is safeguarded, it seems that the Commission may formulate its own standards.

188 F.2d at 14–15. (Emphasis in original; footnotes omitted.)

The Supreme Court has clearly held that great deference shall be given to Power Commission expertise under Section 19(b) of the Natural Gas Act which has, we reiterate, been held by this court, in *Washington Gas Light, supra,* to be analogous to 43 D.C.Code § 706.

> . . . It must be said at the outset . . . [the reviewing] Court's authority is essentially narrow and circumscribed.

> Section 19(b) of the Natural Gas Act provides without qualification that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." More important, we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

Permian Basin Area Rate Cases, 390 U. S. 747, 766–767, 88 S.Ct. 1344, 1359, 20 L.Ed.2d 312 (1968).

 We approach appellant's arguments with these guidelines firmly in mind. It is our duty to examine the Commission's Order to see if it is supported by substantial evidence in the record. This court is not to substitute its view for that of the Commission, even if the Commission chooses between one of two or more permissible but conflicting alternatives. Washington, Marlboro & A. M. Lines v. Public Utilities Comm'n, 114 F.Supp. 328, 333 (D.D.C. 1952), aff'd, 93 U.S.App.D.C. 63, 206 F. 2d 490 (1953). It is especially important to accord great respect to the Commission in a complex, esoteric area such as rate making in which the Commission has been entrusted with the difficult

task of deciding among many competing arguments and policies.[12] Our determination must focus on whether the result reached is arbitrary and appellant bears the burden of clearly demonstrating arbitrary action. He cannot meet this burden by advancing alternative techniques from which the Commission could have chosen. FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Potomac Electric Power Co. v. Public Utilities Comm'n, 81 U.S.App.D.C. 225, 158 F.2d 521, 524 (1946), cert. denied, 331 U.S. 816, 67 S. Ct. 1303, 91 L.Ed. 1834 (1947). United States v. Public Utilities Comm'n, 81 U. S.App.D.C. 237, 158 F.2d 533, 536 (1946), cert. denied, 331 U.S. 816, 67 S. Ct. 1305, 91 L.Ed. 1835 (1947). In any analysis of whether an end result (i. e. the new rate) is not arbitrary, we are aware that since the result is but the "sum of a number of components," each component must be analyzed. Mississippi River Fuel Corp. v. FPC, 82 U.S. App.D.C. 208, 163 F.2d 433, 451 (1947). As is pointed out in the *Mississippi River* case, a component analysis was in fact used by Mr. Justice Douglas in the case of FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) from which the "end result" language is often drawn. *Id.* at 603, 64 S. Ct. 281. We must ascertain, as appellee Pepco agrees, "whether each of the Commission's Order's essential elements is supported by substantial evidence in the record."[13] If each component or element is not arbitrary or capricious, the end result will be a sound one.

### III.

Appellant's assertion that the Commission's Order was arbitrary and un-lawful is predicated upon four separate alleged errors:

1) The Commission erred in including $118,000,000 of construction work in progress in the rate base.

2) The Commission erred in establishing rates based upon an end-of-period rate base, rather than an average figure rate base.

3) The Commission erred in approving an excessive allowance for Federal income taxes as part of the rate base.

4) The Commission erred by allocating an excessive percentage of the system increase to the District of Columbia.

### A. Construction Work in Progress

The Commission, in arriving at a systemwide rate base of $854.3 million, included $118 million of "construction work in progress."[14] This represents generating capability under construction which is not yet complete. Importantly, Pepco does not capitalize interest pertaining to such construction. The District Court sustained this action of the Commission, noting that "the courts generally have deferred to the administrative agency's choice in this matter, assuming, of course, that the result is not unjust or unreasonable."[15]

Utilities normally allocate a portion of their capital to expansion, i. e., to a plant which is under construction. Although such a plant is not yet producing electricity, it involves a cost to the utility during the construction period. The utility must ultimately receive an adequate return on the investment which has been placed in a non-producing plant under construction.[16] This capital can

---

12. *See* United States v. Public Util. Comm'n, 81 U.S.App.D.C. 237, 158 F.2d 533, 536 (1946), cert. denied, 331 U.S. 816, 67 S.Ct. 1305, 91 L.Ed. 1835 (1947).

13. Brief of Pepco at 8.

14. Order No. 5429 at 9; J.A. at 86.

15. Goodman v. Public Service Commission, *supra* n. 2 at 4; J.A. at 18.

16. J. C. Bonbright, Principles of Public Utility Rates 178–79 (1961). Bolster, Should Plant Under Construction be Included in

be reflected in its rate base in one of several methods:

(1) Exclude plant under construction from the rate base, and in determining the realized return, disregard the interest capitalized (or "interest charged construction"). Recognize interest capitalized in the plant when construction is completed and the plant is placed in service.

(2) Include plant under construction in the rate base *and include* interest capitalized in arriving at the realized return. Include interest capitalized when the plant is completed and placed in service.

(3) Include plant under construction in the rate base; do not capitalize interest.[17]

The Commission adopted method (3) here. It included plant under construction in the rate base and did not capitalize interest.

Appellant argues broadly that Pepco is only entitled to have included in the rate base investments which are "used and useful," which appellant asserts must mean actually producing electricity.[18] He would have the Commission utilize method (1) *supra* to secure for Pepco the necessary compensation for its funds expended on construction. In support of this proposition he directs our attention to cases in which various utility commissions have chosen methods other than that adopted here.

Appellant convinces us of no more than the fact that there are several methods for handling plant under construction which have met with both regulatory and judicial approval. The Commission has followed the practice of including such plant under construction in Pepco's rate base for more than twenty years.[19] The Maryland Public Service Commission has approved the same approach in establishing Pepco's rate base.[20] Various courts have also approved inclusion of plant under construction in the rate base. The Maryland Court of Appeals stated:

The cases make it clear that usually there will be included as a part of the rate base either capitalization of interest during construction or the value of plant under construction, but not both since this would mean a duplication . . . .[21]

Appellant's major argument appears to be that if plant under construction is included in the rate base, the ratepayers will be forced to assume a responsibility to pay for property which does not now benefit them and that this duty properly should fall on those who invest in the utility. This overlooks the fact that here Pepco has *not* capitalized interest during construction. The utility must

Rate Base? 87 Pub.Util.Fort., May 27, 1971 at 25.

17. Bolster, *supra* n. 16 at 25–26. For a discussion of the various approaches *see* Bonbright, *supra* n. 16 at 178–80; 1 A.J.G. Priest, Principles of Public Utility Regulation 178–80 (1969).

18. Brief for Appellant at 8.

19. *See, e. g.*, Re Potomac Electric Power Co., 89 P.U.R. (n.s.) 483, 502 (D.C.Pub.Util. Comm'n 1951); Re Potomac Electric Power Co., 28 P.U.R.3d 206, 213, 217 (D.C.Pub. Util.Comm'n 1959).

20. Re Potomac Electric Power Co., 83 P.U. R.3d 372, 380 (Md.Pub.Serv.Comm'n 1970).

21. Baltimore Gas & Electric Co. v. People's Counsel, 220 Md. 373, 152 A.2d 825, 828

(1959); *see also* Re American Tel. & Tel. Co., 9 F.C.C.2d 960, 972 (1967); Goodman v. Public Service Comm'n of the District of Columbia, 309 A.2d 97 at 101–102 (D.C. App., 1973), *and* New England T. & T. Co. v. Department of Public Utilities, 275 N.E.2d 493, 502 (1971). The Massachusetts Supreme Court stressed the Commission's discretion in this decision, stating:

. . . there is likewise no constitutional requirement that the Department in the exercise of its rate-making power should or should not include plant under construction in computing the Company's rate base. This court is not justified in over-ruling the action of the Department merely because it used one approach rather than another in this regard.
275 N.E.2d at 503.

be compensated, either by including in the rate base interest during construction or by including in the rate base the value of funds invested in the plant during construction. It is only when both plant under construction and capitalized interest are in the rate base that there would be produced an improper double return in the year of construction.[22] So long as capitalized interest is *not* included in the rate base, the inclusion of plant under construction provides no excessive compensation to the utility.[23]

In supporting its choice of method for treatment of plant under construction, the Commission articulated its reasons for choosing a method other than that proposed by appellant.[24] In its justification of the inclusion of plant under construction in the rate base, the Commission observed that there were alternative methods available, providing no

double return was granted the utility. The Commission specifically found that "the funds invested in construction are being used for the benefit of the public just as much as funds invested in plant in service," particularly where "the record has demonstrated a continuing need for permanently financing a large construction program."[25] We believe this recitation is sufficient. Funds are not necessarily "used or useful" *only* when they are currently invested in completed plants. In fact, at least one commentator suggests that the method utilized here which requires utility ratepayers to pay construction costs "now rather than later" is, in the long term, the least expensive to the ratepayers.[26] This would make the inclusion of plant under construction in the rate base, with its corresponding elimination of capitalized interest, a desirable alternative. At

22. Bolster, *supra* n. 16 at 27–28.

23. *See, e. g.,* Baltimore Gas & Electric Co., *supra,* n. 21 at 828 of 152 A.2d; Re Commonwealth Edison Co., 85 P.U.R.3d 199, 206 (Ill.Commerce Comm'n 1970); Re Wisconsin Electric Power Co., 77 P.U.R.3d 435, 438 (Wisc.Pub.Serv.Comm'n 1969); and cases cited n. 19 and 20 *supra.*

24. In its initial Order No. 5429, the Commission stated that "neither the staff's thorough review nor the questions raised by intervenors involve any dispute as to items which should be included in the rate base." Order No. 5429 at 9; J.A. at 86. Therefore, the Commission did not articulate specifically its reasons for adopting the particular method chosen.

After Appellant Goodman petitioned the Commission for rehearing, the Commission responded specifically on this issue in Order No. 5434, June 12, 1970 at 3–4; J.A. at 126–27. We are not troubled that the Commission's full explanation comes in its later order.

While clearly the Commission has an affirmative duty to develop a meaningful record, Democratic Cent. Com. of D. C. v. W.M.A.T.C., 158 U.S.App.D.C. 107, 485 F.2d 886, 905 (1973), every conceivable argument cannot be met in advance, and, indeed, when a party wishes to make a unique argument, it would benefit the Commission to have this argument presented at the initial hearing. *See* n. 5 *supra* and accompanying text.

25. Order No. 5434 at 4; J.A. at 127. The record demonstrates the reason for inclusion of plant under construction, *i. e.* to allow a return to Pepco for funds expended for plant expansion. Testimony of witness Davis, Tr. at 626. This method had been utilized previously and was not contested by any witness. Testimony of witness Davis, Tr. at 630.

26. Morris, Capitalization of Interest on Construction: Time for a Reappraisal?, 87 Pub.Util.Fort., March 4, 1971. Mr. Morris states:

A shift from the present method to "no capitalization of interest" results in utility customers paying the carrying costs on new construction now rather than later. Even if elimination of the practice of capitalizing interest requires some immediate rate increase, the longer-term effect runs counter to this. Capitalized interest increases the rate base and requires rate increases in the long run because of the increased depreciation charges (depreciation of capitalized interest) and the return on the undepreciated amount of capitalized interest in the rate base. Elimination of the practice of capitalizing interest will result in lower depreciation charges and a smaller return requirement in the long run, more than sufficient to offset any rate increases required initially.

*Id.* at 26.

any rate, appellant fails to convince the court that there is any legal reason why such a method cannot be used.[27] Since the Commission chose between alternatives, and achieved a reasonable result, we cannot disturb their findings.

■ Appellant makes an additional argument that if plant under construction is included in the rate base, it is necessary to make a compensating adjustment of test year revenue and expenses.[28] It is argued that since the plant will be put into production at a future date and will then generate revenues, such additional net operating income should be anticipated and included in the test year rate base. The Commission did not make such adjustments because

> [T]here is no basis on which we can determine whether the impact of construction work in progress upon net operating income, when such plant is completed, will be substantial. In any event, we have given specific effect to this possibility in setting rate of return at the lowest end of the range we have found to be acceptable.

Order No. 5434 at 4; J.A. at 127.

This statement is sufficient as a rationale. Appellant suggests no method by which such future revenue, expense, and income could be calculated accurately. The treatment of plant under construction utilized here is a recognition of the fact, not disputed, that the utility must be compensated for the use of funds expended for construction. If the Commission were compelled to adjust for projected net operating income, this compensation would be diminished or possibly lost entirely. We, therefore, reject appellant's argument as to adjustments to net income. While appellant's proposed capitalization of interest and exclusion of plant under construction would no doubt be an acceptable alternative to repay the utility for construction funds, the method adopted by the Commission is no less reasonable and we accord the Commission the right to choose between the two. FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

### B. Use of an End-of-Period Rate Base

The Commission utilized the traditional rate-of-return-on-rate-base method of rate making to arrive at Order No. 5429. It was necessary to determine Pepco's revenues, expenses, and resulting net operating income over a "test-period" or "test-year". The Commission adopted the twelve-month period from July 1, 1968 to June 30, 1969 as the test-year.[29] In its ultimate determination of future revenue requirements, the Commission had a choice of two figures: 1) the average values applying throughout the test-year ("weighted" rate base); or 2) the values on the last day of the test-year ("end-of-period" rate base). The Commission chose to use the end-of-period rate base which was higher than

---

27. Appellant's long recitation of cases is not persuasive. As he concedes, cases relied upon by appellee "contain broad language approving departures from the 'used and useful' concept." Reply Brief of Appellant at 3. Appellant advances various arguments in order to distinguish the instant Commission action from previouly approved treatments of plant under construction, e. g. percentage of rate base "under construction", here $14\% \left[ \frac{118 \text{ million}}{854 \text{ million}} \right]$, replacement v. expansion investment, long term v. short term nature of the construction involved.

We believe that such arguments only illustrate the extreme factual complexity of any particular case. This court would be ill-advised to create per se rules which would needlessly interfere with the exercise of Commission expertise.

28. Brief of Appellant at 12.

29. J.A. at 81–6, 92. There were other possible alternative test years, e. g. (1) Calendar year 1968, or (2) Calendar year 1969 (estimated). The Commission chose 12 months ending June 30, 1969 and appellant does not argue that one of the other alternative test years ought to have been used.

average rate base by approximately $54 million.[30] The choice of end-of-period rate base was based upon a finding that Pepco's earnings had been adversely affected by "attrition".

The Commission has defined "attrition":

. . . attrition arises from increases in the cost of plant. During a rate proceeding, the company is given an allowed rate of return based on its investment in its plant. However, as time passes during periods of inflation, and additions or replacements are made to plant, these additions and replacements cost more than similar items did at the time of the rate proceeding. The basic assumption of the rate-making process is that increases in plant will automatically earn the rate of return authorized since they will lead to increased revenues. However, where inflation causes the cost of plant to increase, and the autho-

rized rates remain constant, the rate of return may decline. This phenomenon is what is called "attrition." . . . It involves the question whether the increase in plant cost will outstrip the the increase in net operating income, thus leading to a decline in the rate of return.

Re Potomac Electric Power Co., 64 P.U. R.3d 364, 381 (D.C.Pub.Serv.Comm'n 1966). (Hereafter *"Potomac Electric 1966"*). In *Potomac Electric 1966*, the Commission stated that an average test-year rate base should always be used to evaluate a company's historical record. Normally, such an average rate base should be used to determine future revenue requirements as well. It is the Commission's view that only if there is a showing of attrition in the company's earnings due to inflation is the use of an end-of-period rate base justified. The Commission has previously used such an end-of-period rate base,[31] and the use of such a rate base has been af-

30. The following table illustrates this difference:

| | Weighted | End-of-Period |
|---|---|---|
| 1. Electric plant in service | $877,903,407 | $ 895,889,261 |
| 2. Construction work in progress | 72,097,760 | 117,987,617 |
| 3. Electric plant held for future use | 1,815,001 | 2,618,516 |
| 4. Total Electric Plant | 951,816,168 | 1,016,495,394 |
| 5. Reserve for depreciation— electric plant | (180,130,452) | ( 188,264,786) |
| 6. Net Electric Plant | 771,685,716 | 828,230,608 |
| 7. Materials and supplies | 25,696,141 | 22,943,181 |
| 8. Allowance for cash working capital | 11,783,860 | 12,842,000 |
| 9. Net Plant plus Working Capital | 809,165,717 | 864,015,789 |
| 10. Contributions in aid of construction | ( 9,194,021) | ( 9,668,580) |
| 11. Customers advances for construction | ( 5,819) | ( 5,819) |
| 12. Net Rate Base | $799,965,877 | $ 854,341,390 |

Order No. 5429 at 9; J.A. at 86.

31. *See, e. g.* Re Washington Gas Light Co., 24 P.U.R.3d 417, 427 (D.C.Pub.Util.Comm'n 1958) ; Re Potomac Electric Power Co., 28 P.U.R.3d 206, 217–18 (D.C.Pub.Util.Comm'n 1959) ; in Re Potomac Electric Power Co., 64 P.U.R.3d 364, 382 (D.C.Pub.Serv.Comm'n 1966) the Commission, after defining "attrition" and establishing tests thereof, found on the facts in that case that "attrition" did not exist sufficient to justify the use of an end-of-period base.

firmed by the United States District Court on at least one occasion.[32]

In Order No. 5429, the Commission reaffirmed its view that a finding of attrition is a necessary predicate for the use of an end-of-period rate base.[33] The Commission then specifically found that:

. . . this record does support the conclusion that attrition exists and, accordingly, that an end-of-period rate base should be used in determining the company's future revenue requirement.

Order No. 5429 at 13; J.A. at 90.

Appellant makes three arguments against the use of an end-of-period rate base. He argues, *first*, that there is no basis in the record to support the factual finding of attrition. *Second*, he contends that the use of an end-of-period rate base is improper because it duplicates the consideration given to inflation in establishing the fair rate of return. *Third*, he asserts that the action here constitutes a present payment for past Pepco losses and so is contrary to law.[34]

■ As to appellant's first argument that there is no basis in the record to support a finding of attrition, it is true that there was a strong difference of opinion among the witnesses as to whether attrition existed and whether, if it did, it was inflation-related. Given the limits upon our review of questions of fact under the substantial evidence test,[35] it is sufficient that there exists relevant evidence in the record upon which the Commission could have relied; their view of that evidence, not ours, must prevail. Democratic Central Committee v. W. M. A. T. C., 158 U.S.App. D.C. 68, 485 F.2d 847, 856 (1973).

In *Potomac Electric 1966*, the Commission referred to three factual indices of attrition: 1) a declining rate of return; 2) a comparison of the percentage increase in the average rate base and the percentage increase in net operating income; and 3) the trend of the "operating ratio."[36] Here the Commission found a declining rate of return. On the 1968 average rate base, Pepco earned 6.45%. During the test year it earned 6.27%. For the twelve months ending December 31, 1969, the estimated return was found to be 6.14%.[37] Having found a declining rate of return, the Commission examined the two other indices to ascertain whether this decline was attrition related. The Commission applied the *Potomac Electric 1966* tests[38] and found that "the weighted rate base at June 30, 1969 had grown 39.42% from its level at June 30, 1965, while net operating income in the same period had grown 36.23%."[39] The Commission also found that the operating ratio was increasing throughout 1968 and 1969. This means that for that period, the percentage of revenues remaining after meeting operating expenses

32. Re Chesapeake & Potomac Telph. Co., 57 P.U.R.3d 1, 26 (D.C.Pub.Serv.Comm'n 1964), aff'd sub nom., Telephone Users Ass'n, Inc. v. Public Serv. Comm'n, 271 F. Supp. 393, 394 (D.D.C.1967), aff'd, No. 21,318 (unreported) (D.C.Cir. October 21, 1968), cert. denied, 395 U.S. 910, 89 S.Ct. 1742, 23 L.Ed.2d 223, rehearing denied, 395 U.S. 987, 89 S.Ct. 2127, 23 L.Ed.2d 776 (1969).

33. Order No. 5429 at 13; J.A. at 90.

34. *See, e. g.*, Bebchick v. W.M.A.T.C., 158 U.S.App.D.C. 79, 485 F.2d 858, 865 (1973).

35. Universal Camera Corp. v. NLRB, 340 U. S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456

(1951); Washington, Marlboro and A.M. Lines v. Public Util. Comm'n, 114 F.Supp. 328, 332–333 (D.D.C.1952), aff'd, 93 U.S. App.D.C. 63, 206 F.2d 490 (1953).

36. This is the ratio of operating expenses (excluding taxes and depreciation) to total operating revenues; Testimony of Witness Carr, Tr. at 740.

37. Order No. 5429 at 14; J.A. at 91.

38. Order No. 5429 at 14; J.A. at 91. Order No. 5434 at 5; J.A. at 128.

39. Order No. 5429 at 14; J.A. at 91.

was declining.[40] After a thorough examination of the record, we find that there was ample evidence to support the Commission's findings that the rate of return had declined and that, following the attrition tests from *Potomac Electric 1966,* the decline was attrition related. Mr. Charles L. Carr testified at length, introducing numerous exhibits which support the findings of the Commission as to rate of return, operating ratio increase, and decrease in the percentage increase in operating income in comparison to the percentage increase in weighted rate base.[41] While certainly there was conflicting testimony introduced, the record fully supports the Commission's finding of attrition.[42]

Appellant attacks the factual finding of attrition by stating that the net operating income merely *appears* to grow at a slower pace than the net investment because of the inclusion of construction work in progress in the net investment figure. We find no merit in this argument. Attrition is basically a loss of real revenue dollars to the utility. Plant under construction properly was included in the rate base to compensate the utility for funds expended in construction. (*See* Part III. A. *supra.*) It is true that additions of construction work in progress will depress *current returns.* In *Potomac Electric 1966* the Commission established several indices of attrition, and found that on the evidence there an attrition situation did not exist. There was a substantial amount of plant under construction in the rate base in both the 1966 proceeding and the instant one. Here, however, the record supports the finding that the net operating income is not increasing as fast as plant and that the operationg ratio is up. The Commission was not acting unreasonably when it found that "[t]he impact on the company's return which we *found to exist* goes beyond the simple impact of plant expansion and significantly reflects the effect of inflation . . . .",[43] and this during the period 1966–1969 in which inflation was severe.

 Next, appellant asserts that even if attrition is found, it is error to take account of the effects of inflation twice, *i. e.* by adopting end-of-period rate base and by increasing the overall fair rate of return allowed.[44] We believe that the rate-payers are not being "double-charged." It was proper for the Commission to take inflation into consideration both in setting the rate of return and in choosing an end-of-period rate base because inflation affects the utility in several different ways. Inflationary factors must be noticed and evaluated in determining rate of return in order to permit adjustment to reflect both the current cost of debt capital and a reasonable return on equity capital. Only by analyzing current economic factors can the Commission establish the level of return Pepco should be permitted to earn in the current financial market. In this area extensive testimony was tak-

40. *Id.* The operating ratio was found to be 39.23 for calendar 1967; 42.90 for the test period; and 43.10 (est.) for calendar 1969.

41. Direct Testimony of Witness Carr, Tr. at 736–40, 743, 745, 748; Cross-Examination of Witness Carr, Tr. at 799–800, 801–02, 852–54, 881–82, 886–88. Pepco Exhibit No. 3, p. C–2.2; J.A. at 72; Pepco Exhibit No. 2, p. D–2.2; J.A. at 68; Pepco Exhibit No. 2A, p. D–2.5(a); J.A. at 70. Pepco Exhibit No. 3, p. C–2.1; J.A. at 71.

42. We note that there were other indications of attrition presented to the Commission. However, it chose to rely upon the 3 indices discussed above.

43. Order No. 5434 at 5–6; J.A. at 128–29.

44. In the 1966 proceeding a 6.3% rate of return was allowed. Re Potomac Electric Power Co., 64 P.U.R.3d 364, 388 (D.C.Pub. Serv.Comm'n 1966). In the present proceeding, a 7.1% return was allowed. Order No. 5429 at 45; J.A. at 122. Appellant does not challenge the rate of return ordered here.

The Commission stated: "We do indeed give consideration to the effects of inflation in determining the rate of return." Order No. 5434 at 5; J.A. at 128.

en[45] and fully summarized by the Commission in its order.[46]

The use of an end-of-period rate base was necessitated by another effect of inflation, i. e., the "attrition" of earnings. The Commission concluded that only by utilizing the end-of-period rate base could Pepco actually realize the rate of return independently found to be fair. Had the historical average rate base been used, attrition would have made it unlikely that the company would be able to achieve the desired rate of return in the future.[47]

▆▆ Finally, appellant makes a bare assertion the Commission here permitted Pepco to "charge higher fares in the future to offset past losses."[48] The Commission stated specifically that there was not "a causal relationship between [Pepco's] financial plight and the rate case."[49] Since appellant offers no rationale for his allegation that the Commission by its order intended to recompense Pepco for past losses, we find that he has not met his burden to prove arbitrary action.

In summary, we believe that there was ample evidence to support the Commission's findings of attrition and that the use of an end-of-period rate base was necessary to permit Pepco to realize the desired future revenues. We find no merit in appellant's various alleged errors. As the district court noted,[50] rates must be established *for the future* and the use of an end-of-period rate base which represents the most current data available seems to us a permissible selection well within the discretion of the Commission.[51]

## C. *Allowance for Federal Income Taxes*

▆▆ In Order No. 5429,[52] the Commission granted a system gross rate increase of $19,686,756—representing $9,654,385 for additional after tax income and $10,032,371 for additional taxes.[53] In so doing, the Commission, following its normal practice,[54] applied the maximum statutory tax rate. Appellant asserts that this was error, claiming that since Pepco has historical-

45. *E. g.*, Testimony of Witness Morton, Tr. at 907–13.

46. Order No. 5429 at 16–31; J.A. at 93–108.

47. This is because the use of the 1968 average rate base, which will return a given rate of return *for the historical period*, will fail to do so if the projected average rate base for a future year is considered. *See* Direct Testimony of Witness Carr, Tr. at 746–48; Cross-Examination of Witness Carr, Tr. at 878; Testimony of Witness Davis, Tr. at 597.

48. Brief of Appellant at 29–30; Reply Brief of Appellant at 8.

49. Order No. 5429 at 15 n. 1; J.A. at 92 n. 1.

50. Goodman v. Public Serv. Comm'n, *supra* n. 2 at 6; J.A. at 20.

51. *See, e. g.*, New England T. & T. Co. v. Department of Pub. Util., *supra* n. 21; Board of Supervisors v. Virginia Electric & Power Co., 196 Va. 1102, 1121, 87 S.E.2d 139, 150–151 (1955) and cases cited therein; Re Cheyenne Light Fuel & Power Co., 79 P.U.R.3d 80, 87 (Wyo.Pub.Serv.Comm'n

1969); Re General Teleph. Co. of the Northwest, 23 P.U.R.3d 194, 196 (Idaho Pub.Util.Comm'n 1958); Re California-Pacific Utilities Co., 71 P.U.R.3d 270, 272 (Nev.Pub.Serv.Comm'n 1967); cases cited n. 21 *supra*.

52. As modified by Order No. 5434.

53. Order No. 5434 at 15; J.A. at 138. This represents a composite tax rate of 52.1%: 3.01% gross receipts tax, plus 2.69% D.C. franchise tax, plus 46.40% federal income tax. Order No. 5434 at 7; J.A. at 130. Appellant only alleges error in the size of the allowance for federal income tax.

54. The Commission has always applied a statutory tax rate in computing the required increase or decrease in gross revenues. *See, e. g.*, Re Potomac Electric Power Co., 8 P.U.R.3d 76, 92 (D.C.Pub.Util.Comm'n 1955); Re Potomac Electric Power Co., 28 P.U.R. 3d 206, 220 (D.C.Pub.Util.Comm'n 1959); Re Potomac Electric Power Co., 64 P.U.R. 3d 364, 388 (D.C.Pub.Serv.Comm'n 1966); Re Washington Gas Light Co., 24 P.U.R.3d 417, 444 (D.C.Pub.Util.Comm'n 1958). This practice was apparently not challenged in these cases.

ly paid at an effective rate lower [55] than the statutory rate, this lower effective rate should have been used to determine the new gross revenues to be earned by the company. It is argued that the Commission's failure to consider and adopt a lower rate was unreasonable.

We believe that the Commission acted properly in the treatment accorded federal tax allowance. The method utilized was predicated upon the assumption that "the increase allowed a utility in a rate case is an allowance of additional net income before taxes and not gross income subject to additional expenses." [56] As such "the increase or decrease in net operating income . . . is incremental to the test year data." [57] Appellant argues that it is incumbent upon the Commission to take into account the additional tax deductions for depreciation which will be available when new plant is placed in service.[58]

The Commission is correct in its assertion, sustained by the district court,[59] that under a test-year method of rate making, all additions to (or reductions in) net income are considered *as if they were earned in the test year itself.* Since in arriving at the rate base for the test period all allowable deductions have been taken into effect, no deductions remain to apply to the increased net income and it must be taxed at the statutory rate.

We are mindful of the new construction which will be put on line in the future and the additional deductions which likely will flow therefrom. However, rates are made utilizing data from the test-year, not mere projections of future values. Indeed appellant argues strongly in favor of using test-year values when the principle supports his contentions; [60] he cannot have it both ways. Neither appellant's brief nor our research discloses any case in which any regulatory body has deviated from the test-year method and adopted a method of tax allowance different than that which was employed here.[61] The Commission rates establish an effective tax rate of 23.5%, a figure which is not unreasonable on its face. Since under a test-year method, the increase in net operating income is properly *incremental to the test year,* the Commission should apply the statutory tax rate; to do otherwise would be unnecessarily speculative and not logically related to the test-year method.

### D. *Allocation*

Appellant alleges that the Commission allocates an excessive percentage of the systemwide rate increase to the District of Columbia.[62] The Commission allocated 46.24% of the system revenue requirement to the District, based on their finding that: "During the

---

55. Pepco's effective tax rate—the ratio of income tax expense to income tax expense plus net income—for the test year was 12.7% of pre-tax net operating income since it was able to take tax deductions which exceed its book deductions, *e. g.*, deductions for interest and depreciation. Appellant's Br. at 34.

56. Order No. 5434 at 9; J.A. at 132.

57. *Id.* at 7, 130.

58. Brief of Appellant at 37. Reply Brief of Appellant at 9–10.

59. Goodman v. Public Serv. Comm'n, *supra* n. 2 at 8; J.A. at 22.

60. Appellant argued in favor of an average rate base over an end-of-period rate base claiming that the end-of-period rate base was

"unrelated to the test period earnings of the company." Brief of Appellant at 24. *See* part III, B. *supra.*

61. Indeed there appear to be few cases where the issue is even discussed. In Re Niagra Mohawk Power Co., 92 P.U.R.3d 461 (N.Y.Pub.Serv.Comm'n 1971), the precise argument made by appellant was rejected. However, the N.Y. Commission did not articulate its rationale. 92 P.U.R.3d at 473–74. In *Goodman, supra* n. 21, the District of Columbia Court of Appeals held that the application of a statutory rate was compelled under the test year method. Slip op. at 8–9.

62. Pepco serves the District of Columbia, Maryland, and, to a very limited extent, Virginia. *See* Order No. 5429 at 36; J.A. at 113.

Test-year, 46.24% of the total sales of electricity were derived from customers within the District of Columbia." [63] Appellant attacks this use of an allocation formula which is derived from revenue produced and asks that this court opt for his proposed formula which is based upon relative growth in demand for service between Maryland and the District.

Both the Supreme Court and this court have held that allocation is a question of fact, peculiarly within the expertise of the regulatory agency. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 589–590, 65 S.Ct. 829, 89 L.Ed. 1206 (1945) ; Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 163 F.2d 433, 437 (1947). The pertinent provisions of the D.C.Code do not prescribe a particular allocation formula, but rather require that a rate increase be "reasonable, fair, and just," [64] If, therefore, the Commission's decision here was not arbitrary and was based upon record evidence, it must be affirmed.

▪ The Commission found that Pepco's investment program has been based upon systemwide needs and that "there is no significant difference in the cost of serving customers in the various political jurisdictions in which Pepco operates." [65] This finding is well supported in the record.[66] Appellant alleges that there is "no rational connection" between the systemwide uniformity of Pepco's cost and the allocation formula devised. We disagree. It is not unreasonable to find that whatever conceivable validity the factor of varying growth rates may have in some other context, *here* the cost of customer service is the same for customers in each jurisdiction. Since the use of a systemwide revenue requirement is here not challenged,[67] the Commission must allocate the revenue increase between the various jurisdictions. With cost of service constant, it is not unreasonable to let the share of revenue increase follow the share of total test-year electricity sales applicable to each jurisdiction. By this formula each jurisdiction and customer must bear a share of the revenue increase equal to the amount of electricity that jurisdiction or customer used during the test-year. The latter figure, percentage of sales, is a rough index to costs, because costs are constant as between the jurisdictions. The Supreme Court, in *Colorado Interstate Gas Co.,* *supra*, stated that the regulatory agency must "allocate to each class of the business its fair share of the costs." [68] This was done here, and we will not substitute appellant's proposed allocation system for that chosen by the Commission.

## IV. CONCLUSION

Quite possibly the Commission could have benefited from appellant's views in the hearing phase of this proceeding. For reasons known only to himself, appellant elected not to participate.[69] We will not burden the reader with a reiteration of the proper standard of review. Suffice it to say that under 43 D.C. Code § 706, ours is a limited function, and we hold that appellant has not carried his heavy burden to show that the Commission's findings were clearly erroneous. We hold that the Commission acted properly and reasonably in its disposition of each of the elements of the order under review. We hold that the

63. Order No. 5429 at 38 ; J.A. at 115.

64. 43 D.C.Code § 401 (1973).

65. Order No. 5429 at 37 ; J.A. at 114.

66. Direct Testimony of Witness Walters, Tr. at 1168. Direct Testimony of Witness Kagen, Tr. at 1579.

67. Brief of Appellant at 40.

68. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 588, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945).

69. *See* n. 5 *supra* and accompanying text.

end results of the Commission's action here, *i. e.*, the rate base and rate increase, are just and reasonable.[70] Accordingly, the decision below must be

Affirmed.

70. Appellant has argued in Part V of his brief that the rate increase here granted does not meet the standard of 43 D.C.Code § 401 (1973) that it be "reasonable, fair, and just." We believe that the argument that the "end result" is unjust is merely an amalgam of the arguments on each of the four elements fully discussed above. The resolution of each issue by the Commission was reasoned and based upon substantial evidence; therefore, the end result cannot be assailed.